# United States Court of Appeals
## For the First Circuit

No. 04-1179

UNITED STATES OF AMERICA,

Appellee,

v.

PATRICK O'SHEA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Baldock,[*] Senior Circuit Judge.

Stephen Neyman, on brief, for appellant.
Donald L. Cabell, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, were on brief, for
appellee.

October 20, 2005

[*] Of the Tenth Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  Defendant-appellant Patrick O'Shea was convicted after a jury trial of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  He now appeals, arguing that (1) there was insufficient evidence to support the jury verdict, (2) the district court's jury instruction on reasonable doubt constituted plain error, (3) the district court abused its discretion in denying his motion to exclude certain evidence, and (4) the district court erred in not striking, sua sponte, certain statements made by the prosecution during closing argument.  We affirm.

## I.  Background

Because O'Shea was convicted, we review the facts in the light most favorable to the verdict.  See United States v. Mercado, 412 F.3d 243, 245 (1st Cir. 2005).

On January 22, 2002, shortly before 2:00 PM, Daniel Woods ("Woods") exited the Best Western Roundhouse Suites Hotel at 891 Massachusetts Avenue in Boston, Massachusetts.  Woods got into his car and made a call on his cellular phone.  As he made the call, a black sport utility vehicle ("SUV") pulled up behind his car and blocked him in.  A white male approximately twenty-eight to thirty-one years old, with a shamrock tattoo on the right side of his neck, and wearing a black nylon jacket, a dark cap, and blue jeans got out of the driver's seat.  The man approached the driver's side of Woods car, pointed a shiny silver revolver at Woods's head

-2-

through the open window and demanded "the hotel receipts." The man also demanded that Woods open his trunk, and Woods complied. While the man was searching the trunk, Woods observed a passenger in the SUV. The man took around $100 from Woods, got back into the SUV, and drove away with the passenger.

Woods, who had written down the SUV's license plate number, immediately reported the robbery to the police, who radioed the information to other officers. Less than one minute after receiving the transmission, Boston police officers Richard Rackauskas ("Rackauskas") and Edward Norton ("Norton") spotted the SUV on Dorchester Avenue as they were traveling to the crime scene. They followed the SUV and turned on their lights and sirens. The SUV did not stop, and it eventually reached the intersection of Buttonwood Street and Columbia Road, where it entered Columbia Road going the wrong direction.[1] The police officers followed but stayed on the proper side of the road. The SUV was closest to Rackauskas, who was driving the patrol car. The officers' car was approximately four car lengths behind the SUV.

Columbia Road goes underneath Interstate 93 ("I-93") and leads to a rotary. Just before the SUV reached the I-93 overpass, Rackauskas observed the SUV's passenger stick his arm out the window. The passenger's arm had gray clothing on it. Rackauskas

---

[1] Columbia Road is a six-lane road with three lanes going in each direction, separated by a median.

-3-

saw a "silver metallic shiny object" in the passenger's hand and observed the passenger waving his arm back and forth.  He told Norton that "he's throwing something, there's something hanging out the window, he's got something out the window."  Rackauskas only saw the object for a few seconds, did not see anything come out of the passenger's hand, and could not identify what the object was. Norton testified that he never saw an object and did not recall Rackauskas saying anything about such an object.

The officers lost sight of the SUV for about fifteen seconds as it traveled underneath the overpass and entered the rotary going clockwise, i.e., in the wrong direction.[2]  However, they saw it emerging from the rotary onto Old Colony Avenue and continued their pursuit.  The occupants of the SUV abandoned the vehicle outside the Maryellan McCormack housing projects and ran in front of the patrol car -- which was between fifty to one hundred yards away -- into the housing development.  Rackauskas identified the occupants as two white males: one wearing a black jacket, black hat, blue jeans, and sneakers; the other wearing a blue and grey sweatshirt, blue jeans, and sneakers.  The men ran into an apartment building at 433 Old Colony Avenue.  Rackauskas and Norton, joined by another policeman, Officer Daniel Ryan ("Ryan"), saw the suspects enter the apartment building.  All three officers

---

[2]  Since the SUV entered the rotary going clockwise, the passenger side was closest to the rotary's interior, which is where the gun at issue was eventually found.

initially entered the building, but Rackauskas quickly exited to cover the windows.

The two suspects entered the second floor apartment of Ernest Washburn ("Washburn"), who was home at the time. As Norton and Ryan banged on the door, one of the suspects begged Washburn not to open the door. Washburn opened the door, however, and the suspects jumped out of a window into the courtyard below. In the meantime, Rackauskas had gone around to the back of the building where the courtyard was located. He saw O'Shea, who was dressed in a blue and grey sweatshirt, jeans, and sneakers, limping. Rackauskas ordered O'Shea to stop. O'Shea initially did not obey but eventually surrendered. Soon afterwards, the officers found the other suspect, Kevin Kelley ("Kelley"), in a nearby apartment building. Kelly was wearing a black jacket, had a tattoo on his neck, and was also limping.

Because the dispatch had reported that a silver handgun was used in the robbery, the police searched Kelley and O'Shea, the Maryellan McCormick housing project, and the SUV for the weapon. They did not find a firearm, but found an empty holster in plain view sitting by the center console between the two front seats. Rackauskas directed another policeman, Officer Robert Lucas ("Lucas"), to search the area around I-93 leading to the rotary. Officer Lucas searched the interior island of the rotary and found a silver handgun laying on the ground with nothing on top of it.

-5-

On March 26, 2003, a grand jury issued a superseding indictment charging O'Shea with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). To convict under § 922(g), a jury must to find that a defendant (1) has previously been convicted of a crime punishable by a term of imprisonment exceeding one year, and (2) has knowingly possessed a firearm, (3) that was in or affected interstate commerce. See United States v. Carpenter, 403 F.3d 9, 10 (1st Cir. 2005). The parties stipulated that O'Shea was a felon and that the gun found at the rotary had traveled in interstate commerce. The only issue at trial therefore was whether O'Shea had knowingly possessed the firearm.

After a four-day trial in the United States District Court for the District of Massachusetts, a jury convicted O'Shea. On January 16, 2004, the district court sentenced O'Shea to 180 months imprisonment. O'Shea appealed on January 27, 2004.

## II.  Discussion

### A.  Sufficiency of the Evidence

At the close of evidence, O'Shea filed a motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(a), arguing that the evidence was insufficient to prove that he had knowingly and intentionally possessed the firearm. The district court denied

the motion.[3]  After the jury verdict, O'Shea again filed a Rule 29 motion, which the district court denied.

We review de novo the denial of a Rule 29 motion for acquittal.  United States v. Mercado Irizarry, 404 F.3d 497, 503 (1st Cir. 2005). "In doing so we must decide, viewing the evidence in the light most favorable to the verdict of guilt, whether a reasonable factfinder could find the defendant guilty of the crime beyond a reasonable doubt."  Id.  This standard of review is "formidable," United States v. Loder, 23 F.3d 586, 589 (1st Cir. 1994), and "[d]efendants challenging convictions for insufficiency of evidence face an uphill battle on appeal."  United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000).  In our review of Rule 29 determinations, "'no premium is placed upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction.'"  Id. (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)).

O'Shea argues that the district court erred in denying his Rule 29 motions because there is no evidence, direct or circumstantial, to support his conviction.  He asserts that, although he was observed in the passenger seat of the SUV, there was no evidence linking him to the initial robbery at the Best

---

[3]  The district court did rule that the evidence was insufficient to find that O'Shea constructively possessed the firearm during the robbery, which was one of the government's theories of the case. Accordingly, the district court only instructed the jury on actual possession.

-7-

Western, he was never seen with the gun in his hand, and the silver object seen by Rackauskas could have been anything, something Rackauskas admitted on cross-examination. O'Shea also notes that the gun was located "a good distance" from where Rackauskas observed the shiny metal object in the SUV passenger's hand.

The government argues that there was ample evidence for the jury to conclude that O'Shea was with Kelley when Kelley robbed Woods and that O'Shea threw the silver firearm used in the robbery out the SUV's window as the police chased him and Kelley. We agree that the government has proven its case. There was sufficient evidence for the jury to conclude beyond a reasonable doubt that O'Shea possessed the firearm in the SUV.

The evidence supports the conclusion that O'Shea was the passenger in the SUV when Kelley robbed Woods with a silver handgun. Woods testified that he saw a passenger in the SUV as he was being robbed and that he called the police as soon as the SUV drove off. The report was immediately sent to officers over the radio, and Rackauskas and Norton spotted the SUV less than one minute after receiving the dispatch. It was reasonable for the jury to conclude that the passenger in the SUV when Woods was robbed was the same passenger in the SUV when the officers spotted the vehicle minutes later.

Thus, it was also reasonable for the jury to conclude that this was the same passenger whom Rackauskas saw wave his arm

out the window while holding a shiny metallic object, and the same passenger the officers saw exit the SUV and run into the housing project. And it was reasonable for the jury to conclude that O'Shea, who was apprehended beneath the window the two suspects had jumped out of, was limping, and was wearing the same clothes as the man whom the officers observed running from the SUV, was this same passenger.

Against this backdrop, it was also reasonable for the jury to conclude that the gun found on the rotary island was the same gun used during the robbery. The parties do not dispute that a shiny silver revolver was used during the robbery, or that the gun found at the rotary was a shiny silver revolver. After their apprehension, a silver revolver was not found on either of the suspects, in the housing project, or in the SUV, even though an empty holster was found in the SUV. In light of these facts, it was reasonable for the jury to conclude that the suspects rid themselves of the firearm sometime between the robbery and when they exited the SUV outside of the housing project. This would leave two possibilities: (1) that the suspects disposed of the firearm after the robbery but before they were spotted by the police -- a dubious conclusion since the suspects would have had no motive to dispose of the firearm at that time; or (2) that the suspects disposed of the firearm after they were spotted, but did so when the officers were unable to see them. Under this latter

possibility, the jury could have reasonably concluded that the suspects disposed of the firearm either somewhere in the housing projects or during the period when the officers lost sight of the SUV once it entered the I-93 underpass. However, a search of the housing project turned up nothing, while a search of the area where the suspects were when the police briefly lost sight of them revealed a shiny silver revolver. This revolver was found on the rotary island in the middle of the day, uncovered by any trash or debris; in short, it did not appear to have been sitting there for a long period of time. The jury could have reasonably concluded that this was the same revolver used during the robbery earlier that day.

The jury also must have concluded that O'Shea possessed this revolver. We believe it could reasonably have done so. First, Rackauskas testified that he saw the passenger's arm out the window holding a shiny silver object. O'Shea points out that Norton testified that he never saw the passenger throw an object from the car, never saw the SUV's window go up or down, and never saw a shiny silver object, even though he was the passenger and could pay more attention to the SUV than Rackauskas, who was driving. However, Norton testified that he was handling the radio and watching cars in front of the patrol car and therefore did not have his eyes on the SUV the entire time. Further, Rackauskas testified that he saw the metallic object for only a couple of

seconds. The jury could easily have inferred that Norton simply was not looking in the few seconds that Rackauskas observed the metallic object.

O'Shea also makes much of the fact that Rackauskas saw the object before the SUV went beneath the overpass, while the revolver was found on the other side of the overpass on the rotary island. However, as Rackauskas testified, the time from when the officers lost sight of the SUV to the time they saw it again exiting the rotary spanned only fifteen seconds. Further, it makes sense that O'Shea would have disposed of the firearm at a time when the police could not see the SUV. It also makes sense that he would have disposed of the gun on the rotary island, hoping the grass would hide the gun, rather than simply tossing it into the street. Finally, the fact that the SUV entered the rotary going clockwise means that the rotary grass was on the passenger side of the SUV and therefore nearest O'Shea. The jury could have reasonably concluded that, in the fifteen-second window during which the police were out of sight, O'Shea tossed the gun into the rotary grass that was right next to his side of the car.

O'Shea also points out that Rackauskas admitted that the silver object could have been anything, including a cell phone found after the suspects' arrest. He states that it is "most compelling" that during deliberations the jury sent a note asking the judge where the cell phone was found. However, as the

-11-

government notes, the cell phone was dark grey and plastic, not shiny and silver. Further, the fact that the jury sent the note but still convicted O'Shea simply indicates that the jury was doing its job. It considered O'Shea's theory that the object could have been a cell phone but rejected it.

O'Shea devotes considerable attention to our decision in United States v. Luciano-Mosquera, 63 F.3d 1142 (1st Cir. 1995). However, we do not believe that case is helpful to O'Shea. Luciano-Mosquera involved several defendants engaged in a drug smuggling operation. The police conducted a sting operation and two of the defendants, Luciano-Mosquera and Pava-Buelba, were found under a jeep that had a M-16 concealed in the chassis. Another defendant, Lugo-Maya, was captured on a yawl as he headed out to sea. The yawl was found to have 50 rounds of ammunition. All of the appellants were convicted of possessing firearms during or in relation to a drug trafficking crime. We reversed the convictions of Pava-Buelba and Lugo-Maya, finding that there was no evidence either of them had possessed the gun. The facts of the instant case are quite different, however. As we have already discussed, it was reasonable for the jury to conclude that O'Shea was the passenger in the SUV during the robbery, that the gun found at the rotary was the gun used during the robbery, that the gun found at the rotary was the shiny silver object Rackauskas saw in O'Shea's hand just before the SUV went under I-93, and that O'Shea threw the

-12-

gun into the rotary grass in the roughly fifteen-second window in which the police lost sight of the SUV.  We therefore affirm the district court's denial of O'Shea's Rule 29 motions.

## B.  The District Court's Reasonable Doubt Instruction

O'Shea next challenges the district court's jury instructions on reasonable doubt.  Because he did not object to the instructions during his trial, we review for plain error.  See, United States v. Rodríguez-Marrero, 390 F.3d 1, 25 (1st Cir. 2004). Under plain error review, O'Shea must show that (1) there was an error (2) that was clear or obvious, (3) affected his substantial rights, and (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.  See United States v. Medina-Martínez, 396 F.3d 1, 8 (1st Cir. 2005).

While we have warned against attempts to define "reasonable doubt," noting that "most efforts at clarification result in further obfuscation of the concept[,] . . . a district court does not necessarily commit reversible error by attempting to define the concept of reasonable doubt for the jury."  United States v. Andújar, 49 F.3d 16, 23 (1st Cir. 1995) (internal quotation marks and citation omitted).  Instead, reasonable doubt instructions constitute reversible error "when, taken as a whole, they have a 'reasonable likelihood' of misleading the jury to believe that it can convict on some lesser standard of proof than

that required under the reasonable doubt standard." <u>United States</u> v. <u>Romero</u>, 32 F.3d 641, 651 (1st Cir. 1994).

In the instant case, the jury instructions at issue read as follows:

> Now, I've told you that the burden of proof is on the government to prove the defendant is guilty beyond a reasonable doubt. <u>The burden of proof has nothing to do with who called the witnesses or offered documents into evidence. It goes to the quality of the evidence.</u>
>
> And now I'm going to explain to you in more detail this concept of reasonable doubt.
>
> It is a strict and heavy burden, but it does not mean that a defendant's guilt must be proved beyond all possible doubt. It does require that the evidence exclude any reasonable doubt concerning a defendant's guilt. <u>A reasonable doubt may arise not only from the evidence produced, but also from the lack of evidence.</u>
>
> Reasonable doubt exists when after weighing and considering all of the evidence, using reason, common sense, jurors cannot say that they have a settled conviction of the truth of the charge. Of course, a defendant is never to be convicted on suspicion or conjecture. <u>If, for example, you view the evidence in the case as reasonably permitting either of two conclusions, one, that the defendant is guilty as charged, and the other that the defendant is not guilty, you will find the defendant not guilty.</u>

(emphasis added). O'Shea takes issue with the three emphasized portions of the instructions, arguing that they likely misled the jury as to the proper standard of proof.

-14-

As to the first portion, we find no error, and certainly no error that was clear or obvious. O'Shea argues that the instruction regarding "the quality of evidence" put on onus on the defendant to present evidence. We disagree. If anything, the jury would have interpreted the instruction as having the opposite effect. First, the sentence that the burden "has nothing to do with who called witnesses or offered documents in evidence" indicates that the jury should not consider who put on evidence, but only the evidence itself, meaning that it should not consider the fact that O'Shea did not introduce any evidence. Further, considering other portions of the instruction, there was no likelihood that the jury misunderstood the government's burden. See United States v. Ranney, 298 F.3d 74, 80 (1st Cir. 2002) (stating that, even if a district court gave an improper jury instruction, "we will affirm if in the light of the entire jury charge there was no 'reasonable likelihood' that the jury misunderstood the government's burden"). Elsewhere, the district court stated that O'Shea had no obligation to "prove his innocence," and also specifically stated that O'Shea was not required "to produce any evidence at all."

O'Shea's next argument is that the sentence "[a] reasonable doubt may arise . . . from the lack of evidence" indicated to the jury that it could consider the fact that O'Shea did not present any evidence when considering reasonable doubt. We

-15-

disagree, essentially for the same reasons as above.  If anything, the jury would likely have interpreted that instruction as meaning that a reasonable doubt could arise from evidence the <u>government</u> did not present.[4]  It would make no sense if the instruction meant that a reasonable doubt as to O'Shea's guilt could arise as a result of O'Shea's lack of evidence.  In any event, the district court made it clear elsewhere in the instructions that O'Shea did not have to prove anything and did not have to put on any evidence. We therefore find no plain error.

Finally, O'Shea argues that the district court's "two conclusions" instruction comparing guilt and non-guilt lowered the government's burden of proof to a civil preponderance of the evidence standard.  See <u>Andújar</u>, 49 F.3d at 24 (stating that "due to the risks of misleading the jury, district courts should refrain wherever possible from using a 'guilt or innocence' comparison in their jury instructions").  The district court in the instant case referred to guilt or non-guilt, not guilt or innocence.  As we noted in <u>Ranney</u>, where a court refers "to guilt and <u>non-guilt</u>, rather than innocence, a term less susceptible to the lay response, we find the instruction less troublesome."  298 F.3d at 79. "Nevertheless, telling jurors that the question is one of guilt or non-guilt, without more, could risk undercutting the government's

---

[4]  For example, the government was unable to present direct testimony that O'Shea threw the gun out of the SUV.

-16-

burden by suggesting that the defendant is guilty if they do not think he is not guilty." Id. at 79-80.

Ranney involved a jury instruction very similar to the one at issue here. Id. at 79. There, the district court "repeated its instruction that the government was required to prove guilt 'beyond a reasonable doubt' on some twenty-three occasions." Id. at 80. We affirmed because, taking the jury instructions as a whole, there was no reasonable likelihood that the jury failed to understand the government's burden of proof. Id.[5] In the instant case, the district court stated that the government was required to prove O'Shea's guilt beyond a reasonable doubt at least nineteen times. Further, the district court gave a careful and cogent discussion of the presumption of innocence, made it clear that O'Shea did not have to prove anything or present any evidence, and stated on at least three occasions that the jury could not consider the fact that O'Shea did not testify. See Andújar, 49 F.3d at 24. The district court also stated that "[i]t is not sufficient for the government to establish a probability, although a strong one, that a fact charged is more likely than not. That is not enough to meet the burden of proof beyond a reasonable doubt." This statement decreased the likelihood that the jury would have mistakenly

---

[5]  In Ranney, we affirmed even though we were reviewing under the less stringent abuse of discretion standard because the defendant had objected to the instruction. Id. Here, we are reviewing for plain error.

believed that the government's burden of proof was a civil preponderance standard. Taken as a whole, the jury instructions leave no reasonable likelihood that the jury misunderstood the government's burden. We find no plain error in the district court's instructions.

## C. Evidence of the Robbery

O'Shea's third argument is that the district court erred when it admitted evidence of the robbery because it was not relevant and was unduly prejudicial. The government counters that the district court properly admitted the evidence because the evidence was highly relevant and its probative value substantially outweighed any prejudice to O'Shea.

Prior to trial, O'Shea filed a motion in limine to exclude any evidence pertaining to the robbery of Woods. In the motion, O'Shea argued that evidence of the robbery was not relevant under Fed. R. Evid. 401 and that, even if relevant, the evidence's probative value was substantially outweighed by its prejudicial effect under Fed. R. Evid. 403. In denying the motion, the district court stated that

> I find that, generally, the armed robbery is relevant to proving that there was a gun in the SUV, creates an opportunity for Mr. O'Shea to possess that gun actually or constructively. It's also relevant to the credibility of the police officers' testimony regarding seeing a silver object held outside the passenger side of the vehicle and the government's claim that the gun found on the roadway was previously in the SUV.

-18-

. . .

> I don't think that the 911 call alone would be sufficient because . . . the testimony that Kelley was the driver in a circumstance where it is now alleged there were two people in the car -- as I recall, the 911 call didn't discuss a second person -- is relevant to prove that if Kelley was the driver, O'Shea was the passenger, and if Rackauskas is to be believed and something silver was held out the window and the jury concludes that silver thing was the gun that was later found, it provides relevant and potentially important evidence that Mr. O'Shea was the passenger and the person who held the gun out the window and, therefore, possessed it.

The district court also gave a limiting instruction to the jury making it clear that the jury could not convict O'Shea solely because they believed that he was present at the robbery: "Mr. O'Shea is not charged with participating in a robbery . . . And you're not being asked did he participate in a robbery or was he present for the robbery? You're being asked whether the government has proved beyond a reasonable doubt that he possessed the firearm described in the indictment."

We review a district court's decision to admit evidence for abuse of discretion. See United States v. Flemmi, 402 F.3d 79, 86 (1st Cir. 2005). The district court in this case did not abuse its discretion in admitting evidence of the robbery.

O'Shea's first argument is that evidence of the robbery was in no way relevant to the issue of whether he possessed a firearm. We disagree. Under the Federal Rules of Evidence,

"'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  As the district court noted, evidence of the robbery was relevant to proving that there was a gun in the SUV and created an opportunity for O'Shea to actually possess the gun.  It was also relevant to the government's claim that the gun found on the rotary was in the SUV.  Further, the evidence of the robbery was relevant to Rackauskas's credibility regarding his testimony that he saw a silver object held outside the passenger side of the SUV.  In other words, evidence of the robbery makes it more likely than not that O'Shea was the passenger in the SUV, had the opportunity to possess the gun, and had the motive and opportunity to throw the gun from the SUV onto the rotary.[6]  We therefore agree with the district court that evidence of the robbery was relevant.

O'Shea's second argument is that the admitted evidence's probative value was substantially outweighed by its prejudicial effects.  See Fed. R. Evid. 403.  We have stated that "[o]nly rarely -- and in extraordinarily compelling circumstances -- will

---

[6]  As the government notes, O'Shea's brief basically concedes this point.  In arguing that the evidence was unduly prejudicial, O'Shea states that "it requires much less a stretch of one's imagine [sic] to deduce the unproven suggestions that Kelley's accomplice was a participant in the armed robbery, and being aware of the gun attempted to dispose of the same."

we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Flemmi, 402 F.3d 79, 86 (internal quotation marks and citation omitted). O'Shea's case does not present such an extraordinarily compelling circumstance.

We acknowledge that the evidence of the robbery was certainly prejudicial to O'Shea. However, that is not enough. We have stated that "[v]irtually all evidence is prejudicial -- if the truth be told, that is almost always why the proponent seeks to introduce it -- but it is only unfair prejudice against which the law protects." United States v. Pinillos-Prieto, 419 F.3d 61, 72 (1st Cir. 2005) (internal quotation marks and citation omitted) (emphasis in original). We do not think that any unfair prejudice occurred here, especially given the district court's instructions to the jury. As we noted above, the district court expressly instructed the jury that O'Shea was not being charged with the robbery and that the only way the jury could convict him was to find beyond a reasonable doubt that he possessed a firearm. We believe that these instructions limited the risk of unfair prejudice to O'Shea. See United States v. Taylor, 284 F.3d 95, 104 (1st Cir. 2002). We therefore affirm the district court's decision to admit evidence of the robbery.

## D.  Prosecutor's Closing Remarks

O'Shea's final argument is that the district court committed plain error[7] in not striking portions of the prosecutor's closing remark because they focused on matters not in evidence that likely affected the trial's outcome.  Specifically, O'Shea argues that the prosecutor improperly focused on O'Shea's involvement with Kelley in the robbery of Woods.  O'Shea points to twelve statements by the prosecutor which linked O'Shea to Kelley and the robbery of Woods.  According to O'Shea, "there is absolutely no evidence of his [O'Shea's] involvement in the robbery."  We disagree.

While "[i]t is well settled that in its closing argument the prosecution may not rely on knowledge or evidence unavailable to the jury . . . the prosecutor may attempt to persuade the jury to draw inferences from the evidence." United States v. Hamie, 165 F.3d 80, 84 (1st Cir. 1999) (internal citation omitted).  The instant case presents an example of the latter situation.  While there was no direct evidence linking O'Shea to the robbery, there was ample circumstantial evidence, including the testimony of Woods, the police officers, and Washburn, from which the jury could have inferred that O'Shea was present at the robbery.[8]  The

---

[7]  O'Shea did not object to the statements at trial, which is why he now argues for plain error.

[8]  We have already recounted this evidence in our discussion of O'Shea's sufficiency of the evidence challenge.

government was entitled to attempt to persuade the jury to draw certain inferences from that evidence.

O'Shea also argues that "[g]iven the lack of evidence linking O'Shea to the gun near the rotary, it is likely that the jury convicted for possession at the hotel rather than possession during the chase." However, this argument is muted by the district court's instruction that "Mr. O'Shea is not charged with participating in a robbery . . . And you're not being asked did he participate in a robbery or was he present for the robbery? You're being asked whether the government has proved beyond a reasonable doubt that he possessed the firearm described in the indictment."

In sum, we do not find any plain error in the prosecutor's closing remarks. We therefore reject O'Shea's arguments on this issue.

### III. Conclusion

For the foregoing reasons, we affirm O'Shea's conviction.

**Affirmed**.