James Darwin AUTRY, Petitioner,
Appellant,

v.

J. C. WILEY, Rear Admiral, USN etc.,
et al., Respondents, Appellees.

No. 7778.

United States Court of Appeals,
First Circuit.

April 13, 1971.

Stanley Berg (argued), of Buckner, Aragon & Berg, Long Beach, Cal., for petitioner-appellant.

David Anderson, Asst. U. S. Atty. (argued), William M. Byrne, U. S. Atty., Los Angeles, Cal., John N. Mitchell, Atty. Gen. of U. S., Washington, D. C., Joseph Sureck, Reg. Counsel, INS, San Pedro, Cal., Stephen M. Suffin, Atty., INS, San Francisco, Cal., for appellee.

Before CHAMBERS and TRASK, Circuit Judges, and FREY, District Judge.

Harvey A. Silverglate, Boston, Mass., with whom Zalkind, Klubock & Silverglate was on the brief, for appellant.

George V. Higgins, Asst. U. S. Atty., with whom Herbert F. Travers, Jr., U. S. Atty., was on the brief, for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Petitioner, James Darwin Autry, a member of the United States Naval Reserve, left his ship, the USS. McCAFFREY, on July 20, 1969, after it had docked at Halifax, Nova Scotia, Canada. When the McCAFFREY sailed, petitioner was not aboard. Autry desired to become a Canadian citizen and obtained and filed an application for Landed Immigrant status. About three months later he was arrested by Canadian Military Police at the request of American authorities under the Canadian Visiting Forces Act, Statutes of Canada, 1967–68, ch. 23. Autry was transferred to the custody of Lt. Commander Hildebrand of the U. S.

Navy who escorted him to Boston, Massachusetts, to stand trial for desertion and other charges. While in Canada under both Canadian and American custody, petitioner's request that he be furnished legal counsel was denied. At no time while in Canada or en route to Boston was he advised of any of his legal rights.

Autry's petition for habeas corpus relief before the U. S. Court of Military Appeals was denied. No action was taken on Autry's subsequent petition to the federal district court pending completion of his court martial. Petitioner was convicted of desertion, missing the movement of his ship, and two minor charges, and sentenced to four years confinement at hard labor, dishonorable discharge, forfeiture of all pay and allowances and reduction in grade. Petitioner then amended his habeas corpus petition in the district court. Respondents, officers having custody of Autry in Boston, filed a motion to dismiss, which was granted by the district court on the ground that petitioner had not exhausted his remedies within the military system. This appeal followed.

■■ Respondents renew their argument, successful in the district court, that petitioner is not properly before us because he has not exhausted his remedies within the military judicial system. But one of petitioner's two claims asserted here is jurisdictional in the strict sense, namely, that the circumstances under which petitioner was brought back to this country from Canada violated the Status of Forces Agreement between the parties to the North Atlantic Treaty. If the Agreement—itself a treaty—was violated, Autry argues, then under the doctrine of United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), the respondents would have acted without jurisdiction over petitioner. This kind of claim is properly cognizable by a federal civil court without requiring exhaustion.[1]  Cf. Allen v.

1. Petitioner's other claim, that he was denied effective assistance of counsel at a critical stage of the proceedings against him, i. e., while in Canada, is not prop-

VanCantfort, 420 F.2d 525, 526 (1st Cir. 1970); Noyd v. Bond, 395 U.S. 683, 696 n. 8, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969); Note, Developments in the Law —Federal Habeas Corpus, 83 Harv.L. Rev. 1038, 1233 n. 169 (1970).

Petitioner's major argument can be summarized in syllogistic form: the Status of Forces Agreement limits United States military jurisdiction in Canada to members of a military force in Canada on official duty; at the time of his arrest, neither he (having deserted) nor his "force" (his ship having left port) was in Canada in connection with official duties; therefore, the Agreement confers no jurisdiction on either Canadian or United States authorities to deal with him. He claims support for his interpretation of the Agreement in a Canadian provincial court decision applying that country's Visiting Forces Act to an allegedly similar situation.

Petitioner relies upon *Rauscher* and Cook v. United States, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1932) for the broad proposition that "obtaining custody in violation of a treaty defeats United States jurisdiction." *Rauscher* and *Cook,* however, are both limited exceptions to the more general rule created in Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), that "neither the method by which an accused is brought before a criminal court, nor the legality of his forcible seizure or arrest * * * nor his subsequent forcible and illegal transportation and confinement are material to the question of the jurisdiction of a criminal court before whom he is present." United States v. Rubenstein, 19 CMR 709, 802, aff'd, 22 CMR 313 (1955) (applying the *Ker* rule to military tribunals). *See also* Chandler v. United States, 171 F.2d 921, 933–936 (1st Cir. 1948), cert denied, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949).

*Cf.* Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952).

In *Rauscher* the accused was extradited from Great Britain on a charge of murder but upon return to New York was tried on a different charge, one not included on the list of extraditable offenses in the British-American treaty. The court held Rauscher could be tried only "for the offence with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been given him, after his release * * * to return to the country from whose asylum he had been forcibly taken under those proceedings." *Rauscher, supra* at 430, 7 S.Ct. at 246. The *Rauscher* exception has been applied only in situations where an American court tries the fugitive for a crime other than the one for which extradition was granted; in short, where there is not only a betrayal of the understanding of the surrendering nation but an action clearly contrary to the specific authorization of the treaty by the receiving nation. Johnson v. Browne, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907); Cosgrove v. Winney, 174 U.S. 64, 19 S.Ct. 598, 4 L.Ed. 897 (1899); *cf.* United States ex rel. Donnelly v. Mulligan, 74 F.2d 220 (2d Cir. 1934). The exception might arguably cover a case where the country of asylum delivers up a fleeing criminal, expressly or impliedly attaching certain conditions to the return. When the asylum country's expectations go unfulfilled, the accused might be allowed to raise the matter as a jurisdictional defect. Even under such an expansive interpretation, the *Rauscher* exception cannot cover the petitioner's case. As the Court stated in *Ker,* "The right of [a government] voluntarily to give a party * * * an asylum * * * is quite a different thing from the right in him to demand and insist upon security

---

erly before us. Petitioner, who has an appeal from his conviction pending in the higher military court, has not exhausted his remedies within the military system on this matter, a necessary prerequisite to our consideration. Gusik v. Schilder,

340 U.S. 128, 131–132, 71 S.Ct. 149, 95 L.Ed. 146 (1950); Allen v. VanCantfort, 420 F.2d 525, 526 (1st Cir. 1970); Note, Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1232–1238 (1970).

**802**

in such an asylum." 119 U.S. at 442, 7 S.Ct. at 228. Canadian authorities voluntarily facilitated petitioner's apprehension and turned him over to American authorities with full understanding that desertion was the pending charge. No "ground rules" of the return are even alleged to have been violated here; the *Rauscher* exception is unavailing.

The second exception to *Ker*, recognized by Mr. Justice Brandeis in *Cook*, covers the particular situation where the United States has by treaty "imposed a territorial limitation upon its own authority". *Cook, supra* at 121, 53 S.Ct. at 312. *Cook* involved a British vessel caught in rum running by American authorities outside the American jurisdictional perimeter set by British-American treaty covering the apprehension of Prohibition violators. The court held the United States "lacking power to seize, lacked power, because of the Treaty, to subject the vessel to our laws. To hold that adjudication may follow a wrongful seizure would go far to nullify the purpose and effect of the Treaty." *Cook, supra* at 121-122, 53 S.Ct. at 312. The *Cook* exception applies only to violations of a specific territorial jurisdictional circumscription set by treaty. The *Agreement* in the case at bar contains no such limitation.

We view *Rauscher* and *Cook* as narrow exceptions to the *Ker* rule. They fail to provide for the sweeping proscription petitioner suggests. Although petitioner contends that the treaty was "violated", he is really claiming that the treaty did not apply to him because he was not a "member of a force" on the date of his arrest. But such a claim, even if well founded, is only that petitioner was beyond the scope of the treaty, not that the treaty was violated. The treaty says that Canada and the United States will treat Americans who are members of visiting forces in a certain way. Both nations must, of course, adhere to the treaty when dealing with such personnel, but there is no reason why they cannot, if they choose, adhere to the procedures of the treaty even when the person is not a member of a visiting force.

■ Petitioner therefore cannot claim to be "clothed with rights" as an intended beneficiary of a duty owed by the United States to Canada under the Agreement. *Ker, supra* at 443, 7 S.Ct. 225. Even if the voluntary arrangement between United States and Canadian authorities violated Canada's internal law, such a fact does not undermine the jurisdiction of a court to try petitioner for desertion. *Ker, supra* at 444.[2] 7 S.Ct. 225. Petitioner's dilemma is insurmountable. If he falls within the treaty's scope, his apprehension and return were entirely proper. If he falls without the treaty's scope, the *Ker* rule makes his jurisdictional claim groundless.

■ While these views make it unnecessary to interpret the Status of Forces Agreement, we do not intend to imply that the action of Canadian and United States authorities was in violation of that Agreement. The desertion of a United States serviceman was an offense solely against the United States and within its exclusive jurisdiction, Ar-

---

2. Petitioner relies on a decision of a Justice of the Supreme Court of British Columbia, an intermediate court of that province, holding that Canadian custody of a deserter from a British Army unit, since departed, was in violation of the Canadian Visiting Forces Act, there not being in Canada any "visiting force". In the Matter of the Visiting Forces Act, 1967–68 R.S.C. Chap. 23 and Amendments thereto and In the Matter of Anthony George Hewitt, No. x 803/69, October 20, 1969. The court observed that the record showed

no evidence of any British forces in Canada at the time. Whether this fact was determinative or not and to what extent the decision is authoritative, the Court of Appeal of the province having affirmed solely on the ground that the authority for delivery of the deserter to "authorities of [his] unit" could not be carried out, are irrelevant. Even if the Canadian law was violated, petitioner would have no more basis to challenge the jurisdiction under which he is presently held than the plaintiff in error in *Ker, supra*.

ticle VII, 2(a); the United States had the obligation to report his absence to Canadian authorities after twenty-one days, Article III, 4; the Canadian authorities were obligated to assist in his arrest and hand him over to "the authority which is to exercise jurisdiction", Article VII, 5(a). The Agreement clearly contemplates mobility of visiting forces, providing specifically for forces "passing in transit", Article I, 1(c). Were departure of a military unit to deprive the sending and receiving countries of power to act under the Agreement with respect to deserters from the unit, servicemen left behind for trial could be deprived of the safeguards provided by Article VII, 9; and orderly resolution of tort, tax, and customs obligations would be frustrated. We doubt that the Agreement should be so interpreted.

Affirmed.