# United States Court of Appeals
## For the First Circuit

Nos. 14-1993
     15-2194

UNITED STATES OF AMERICA,

Appellee,

v.

EVRIPIDES GEORGIADIS,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Barron, Circuit Judge,
Souter,* Associate Justice,
And Selya, Circuit Judge.

Andrew Levchuk, with whom Bulkley, Richardson & Gelinas was on brief, for appellant.
Alex J. Grant, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

April 8, 2016

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**BARRON**, <u>Circuit Judge</u>.  This case concerns a defendant's appeal of his convictions and sentence for participating in a complex, multi-million dollar investment fraud.  Finding no error, we affirm in all respects.

**I.**

The appellant is Evripides Georgiadis, a Greek national. On June 16, 2011, he was named in an indictment by a federal grand jury in Massachusetts.

The indictment charged Georgiadis and three others -- John Condo, Michael Zanetti, and Frank Barecich -- with creating a fictional private equity fund, known variously as "BBDA Global Investment Fund" or "DAC Global," and making false promises about that fund to defraud unwitting developers into making deposits totaling nearly $8 million into bank accounts controlled by the defendants from February 2008 through August 2010.  The indictment set forth fourteen counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.  A superseding indictment, dated September 22, 2011, added a sixteenth count for conspiracy to commit money laundering.[1]

_____

[1] In the superseding indictment, this sixteenth count was entitled simply, "18 U.S.C. § 1956(h) - Conspiracy To Commit Money Laundering."  The substantive allegations of the superseding indictment then made clear that the defendants were charged with conspiring both to launder money, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and to engage in monetary transactions in

The following May, Croatian law enforcement authorities arrested Georgiadis at a border crossing in Croatia. In June of that year, the United States sought his extradition for trial on the charges set forth in the superseding indictment, and in December of that year Croatia's Ministry of Justice authorized his extradition.

Prior to trial, Georgiadis moved for dismissal of the conspiracy to commit money laundering count on the ground that his extradition did not authorize his trial on that count. The District Court denied the motion.

Over the course of March and April of 2014, Georgiadis's three co-defendants entered guilty pleas. Georgiadis did not. His trial began on April 22, 2014.

At the close of the government's case, three of the wire fraud counts were dismissed on the government's motion. As a result, only thirteen total counts -- including the conspiracy to commit money laundering count -- went to the jury.

---

criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity, in violation of 18 U.S.C. § 1957. 18 U.S.C. § 1956(h) sets out the penalty for a conspiracy to commit "any offense defined in this section or section 1957." Because nothing in our opinion depends on this more detailed description of Count 16, we will refer to this count as being for "conspiracy to commit money laundering."

On May 14, 2014, the jury returned guilty verdicts on all thirteen counts. The District Court then sentenced Georgiadis to 102 months of imprisonment.

Georgiadis raises a number of challenges here.[2] Some relate only to his conviction for conspiracy to commit money laundering. Others relate to each of his convictions. He also challenges his sentence. We consider his arguments in this order, and we reject each of them.

## II.

Georgiadis makes two separate challenges to his conviction on Count 16, which charged him with conspiracy to commit money laundering.[3] The first challenge concerns his extradition. The second challenge concerns venue.

---

[2] Technically, Georgiadis appealed twice: once from the District Court's entry of judgment on September 17, 2014, and once from the District Court's entry of an amended judgment on September 18, 2015. The amended judgment differed from the original only in specifying that Georgiadis and his co-defendants were to be jointly and severally liable for the restitution order that both judgments imposed. We consolidated the two appeals, and the parties stipulated that only one round of briefing and argument was necessary. We thus consider the two appeals as one.

[3] This count was listed as Count 16 in the superseding indictment, but it is listed as Count 13 in the redacted indictment that was produced after the District Court granted the government's motion to dismiss three counts from the superseding indictment at the close of the government's case. For simplicity, we will refer to this count as Count 16 throughout.

- 4 -

**A.**

Georgiadis's extradition-based challenge implicates the "principle of specialty," or, as it is also known, the "doctrine of specialty." United States v. Tse, 135 F.3d 200, 204 (1st Cir. 1998); United States v. Saccoccia, 58 F.3d 754, 766 (1st Cir. 1995). That doctrine "generally requires that an extradited defendant be tried for the crimes on which extradition has been granted, and none other." Saccoccia, 58 F.3d at 766.[4] "Because the doctrine of specialty is concerned with comity rather than the rights of the defendant, . . . [it] exists only to the extent that the surrendering country wishes." Tse, 135 F.3d at 205. For that reason, "[i]n general, we do not believe that there can be a violation of the principle of specialty where the requesting nation prosecutes the returned fugitive for the exact crimes on which the surrendering nation granted extradition." Saccoccia, 58 F.3d at 768.

Here, the decision of the Croatian Ministry of Justice (the "Decision") clearly authorized Georgiadis's extradition on all counts charged in the indictment, including Count 16. [Dkt. No. 157, Ex. 1, 1]. Indeed, the Decision specifically states that

_____

[4] We assume without deciding that Georgiadis has standing to bring his extradition challenge. See Saccoccia, 58 F.3d at 767 n.6 (1st Cir. 1995) (noting that "[t]here is some dispute whether alleged violations of the principle of specialty can be raised by a criminal defendant").

Georgiadis "can be extradited . . . based on the probable cause that he has committed . . . one criminal act of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956 (h)."

Nevertheless, Georgiadis contends that Croatia did not actually intend to extradite Georgiadis on Count 16. To support this surprising contention, he points to the statement in the Decision that expressly purports to extradite Georgiadis "[p]ursuant to the provisions of" a 1902 treaty between the United States and what was then Servia ("1902 Treaty").[5] Georgiadis argues that the Decision nowhere states that conspiracy to commit money laundering is an offense covered by that 1902 Treaty. And Georgiadis further contends that the 1902 Treaty does not, in fact, cover that offense. Georgiadis also appears to argue that the Decision misidentified Count 16 as a reference to a "computer fraud" crime. Thus, Georgiadis concludes, the Decision is best read to authorize Georgiadis's extradition for only those crimes that are covered by the 1902 Treaty or, "[a]t best," to "reflect[] confusion" about the substance of Count 16.

But Georgiadis's contention that Croatia did not actually authorize his extradition for Count 16 is not one that Croatia itself advances. Nor is it one that can be reconciled

---

[5] The Decision actually refers to the treaty as being from 1901, because that is when the treaty was signed. It was then ratified by both countries in 1902.

with the plain language of the Decision that Croatia issued to authorize Georgiadis's extradition. The references in the translated Decision to "computer fraud" seem clearly to track the wire fraud counts against Georgiadis, and the "justification" section of the Decision separately refers to "money laundering" on multiple occasions. Thus, the Decision does not reveal the confusion that Georgiadis claims it reflects, and it simply cannot be read to limit Georgiadis's extradition such that it does not cover Count 16.

Georgiadis does also appear to argue that even if Croatia intended to extradite him on Count 16, the 1902 Treaty barred Croatia from doing so because the treaty does not cover the crime of conspiracy to commit money laundering. He relies on United States v. Rauscher, 119 U.S. 407 (1886), which states at one point that a defendant extradited pursuant to a treaty can "only be tried for one of the offenses described in that treaty." Id. at 430.

But we have previously made clear that Rauscher applies to "situations where an American court tries the fugitive for a crime other than the one for which extradition was granted." Autry v. Wiley, 440 F.2d 799, 801 (1st Cir. 1971); see Rauscher, 119 U.S. at 424 (explaining that an extradited defendant has a right to "be tried only for the offense with which he is charged in the extradition proceedings, and for which he was delivered up"). And, as we have explained, Croatia made clear in its Decision that it

extradited Georgiadis for trial on the conspiracy to commit money laundering count for which he was tried.

To the extent Georgiadis argues that we may independently determine that Croatia lacked the authority to effect the extradition that Croatia plainly authorized in its Decision "[p]ursuant to the provisions of the [1902 Treaty]," we rejected an equivalent argument in Autry. In doing so, we relied on the Supreme Court's decision in Ker v. Illinois, 119 U.S. 436 (1886). We explained in Autry that the Court in Ker held that, subject to limited exceptions not applicable here, "neither the method by which an accused is brought before a criminal court, nor the legality of his forcible seizure or arrest . . . nor his subsequent forcible and illegal transportation and confinement are material to the question of the jurisdiction of a criminal court before whom he is present." Autry, 440 F.2d at 801. Thus, this aspect of Georgiadis's extradition-based challenge also cannot succeed. Id. (explaining that the defendant could not challenge his conviction on the ground that the treaty did not authorize Canada's extradition of him because "[i]f he falls within the treaty's scope, his apprehension and return were entirely proper. If he falls without the treaty's scope, the Ker rule makes his jurisdictional claim groundless.").[6]

---

[6] Although Autry is dispositive, we also note that the Restatement (Third) of Foreign Relations § 476 (1987), on which

- 8 -

**B.**

We now turn to Georgiadis's other ground for challenging his conviction on Count 16 -- that he was denied his right under the Constitution and the Federal Rules of Criminal Procedure to be tried in a venue "wherein the crime [was] committed."  U.S. Const. amend. VI; see U.S. Const. art. III § 2, cl. 3; Fed. R. Crim. P. 18.  In pressing this contention, Georgiadis agrees, as he must, that if he or any of his co-conspirators took an overt act in furtherance of the conspiracy to commit money laundering in Massachusetts, then venue in the District of Massachusetts was proper.  [Blue Br. 27-28]; See 18 U.S.C. § 1956(i)(2) ("A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought . . . in any [] district where an act in furtherance of the attempt or conspiracy took place."); Whitfield v. United States, 543 U.S. 209, 218 (2005) (explaining that § 1956(i)(2) functions as a confirmation of the "longstanding

---

Georgiadis relies, does not support his assertion that "[i]t is a fundamental requirement that the crime for which extradition is sought also be one provided for by the applicable treaty."  Nor does the Second Circuit's decision in Sacirbey v. Guccione, 589 F.3d 52 (2d Cir. 2009), on which Georgiadis also relies, support his challenge.  That case involved the extradition by the United States of a defendant to Bosnia & Herzegovina, another country to which the 1902 Treaty applies.  Id. at 56, 58.  The fact that the Second Circuit held our own government to the terms of the 1902 Treaty in that case is not support for the proposition that Georgiadis may challenge his conviction on the ground that a foreign nation lacked the power that it claims to effect the extradition pursuant to that treaty.

rule" that "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense").  But Georgiadis contends venue was not proper because there was no basis for finding that such an overt act was taken.  We disagree.

Where a venue determination has been made by a jury, as happened here, "[w]e will uphold the verdict[] . . . if a rational juror could have found . . . proper venue by a preponderance of the evidence."  United States v. Josleyn, 99 F.3d 1182, 1190 (1st Cir. 1996).  In applying that standard, "[a]ll credibility issues are to be resolved, and every reasonable inference drawn, in the light most favorable to the verdict."  Id.

We have specifically held that, because the "central objective" of a conspiracy to commit money laundering is "to conceal or disguise," an action taken by a conspirator to "facilitate[] the concealment aim of the money laundering transactions" is an overt act in furtherance of such a conspiracy. United States v. Upton, 559 F.3d 3, 10-12 (1st Cir. 2009) (finding that failing to file a tax return was an overt act in furtherance of a conspiracy to commit money laundering).  And the Supreme Court, in the context of a case involving mail fraud, has identified one type of act that facilitates the concealment of a crime to be a "lulling" communication -- a communication "designed to lull the victims into a false sense of security, postpone their

- 10 -

ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely." United States v. Lane, 474 U.S. 438, 451-52 (1986); see also United States v. Rutigliano, 790 F.3d 389, 396-97 (2d Cir. 2015) (holding that mailings made to prevent the discovery of mail fraud are an overt act in furtherance of a conspiracy to commit mail fraud); United States v. Perry, 152 F.3d 900, 904 (8th Cir. 1998) (same). Thus, if the evidence in this case supports a jury's reasonable finding that Georgiadis or any of his co-conspirators made a "lulling" communication with respect to the money laundering in or into Massachusetts, then venue in the District of Massachusetts was proper. See United States v. Gonzalez, 683 F.3d 1221, 1225 (9th Cir. 2012) (upholding venue in the target district because a conspirator "conducted communications with someone located in [the target district]"); Naranjo, 14 F.3d 145, 147 (2d Cir. 1994) (upholding venue in the target district based on "numerous phone calls" made by a conspirator to a non-conspirator in that district); United States v. Cordero, 668 F.2d 32, 44 (1st Cir. 1981) (finding it "highly likely" that calls placed by a non-conspirator in the target district to conspirators outside the target district supported venue in the target district but ultimately deciding the issue on waiver).

We conclude that the evidence does provide sufficient support for that conclusion. Specifically, the jury could

reasonably have found that a series of e-mails sent in 2010 by one of Georgiadis's co-conspirators -- Michael Zanetti -- to a Massachusetts-based company constituted "lulling" communications aimed at concealing the money laundering.  The evidence showed the following regarding those communications.

In February 2010, the Massachusetts-based broker Valence Financial Group worked with DAC Global, a corporation that had been created by Georgiadis and his co-conspirators, on a funding arrangement for one of Valence's clients.  DAC Global agreed to provide that client, Green Investment Group, with funding for a building project, and Green deposited $500,000 into a DAC Global account.  Months went by, and Green received no funding from DAC Global.  As a result, Valence contacted Zanetti, who was acting as a DAC Global representative, and attempted to recover the deposit.

The evidence further showed that Zanetti then sent a series of e-mails to Valence.  Initially, Zanetti promised that the "issues" with the deposit were "in the process of being overcome" and that he would soon be able to provide a more detailed explanation for the delay.  A Green representative then sent an e-mail to Zanetti, copying Valence, that read: "We are completely out of patience with you and your promises of performance.  If we do not hear from you and get satisfactory answers within 24 hours, we will contact the U.S. Department of Justice and begin to pursue any and all means of redress available to us, against you and your

enterprises."  Zanetti responded the next morning with an e-mail to both Green and Valence.  That e-mail read: "From what I understand, you are going to be receiving a letter from the fund's appointed reps detailing everything.  Before you ask: I don't know who they are, but I was told you would be contacted shortly."

The entire aim of the money laundering scheme was to conceal, and the jury specifically found that the scheme lasted until September 2011.  In light of that, the jury could reasonably have found that Zanetti sent these e-mails specifically to delay the date Valence or Green went to the authorities, as Green had stated they would do.  Thus, the jury could reasonably have found that these e-mails were "designed to lull [Valence and Green] into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely."  See Lane, 474 U.S. at 451-52.  And because Zanetti's "lulling" communications were made to a company based in Massachusetts, they suffice to support venue in the District of Massachusetts for Count 16.[7]

---

[7] Because we find Zanetti's communications to Valence sufficient to support venue for Count 16, we need not address the government's other claimed basis for venue: rent payments Georgiadis made (arguably with money derived from unlawful activity) to a Massachusetts-based landlord.  We do note, however, that while Georgiadis vigorously contests whether those payments "ever touched Massachusetts," he makes no such argument about Zanetti's communications to Valence.

We therefore reject Georgiadis's venue-based challenge to his conviction on Count 16.[8] We now turn to his remaining challenges, which target his convictions generally.

## III.

Georgiadis claims that the District Court made four separate errors at trial that each independently requires us to vacate all of his convictions. We do not agree.

## A.

The first of these trial-based challenges relies on Batson v. Kentucky, 476 U.S. 79, 93, 98 (1986), which prohibits "purposeful discrimination" in the use of a peremptory challenge against a member of a protected class. Id. at 98; United States v. Girouard, 521 F.3d 110, 115 (1st Cir. 2008). Georgiadis argues, as he did below, that the government engaged in impermissible purposeful discrimination by using one of its peremptory challenges to strike a juror named Ms. Paunovic,[9] and he contends

---

[8] United States v. Cabrales, 524 U.S. 1, 6 (1998), on which Georgiadis relies, is not to the contrary. In Cabrales, the Court held that a defendant accused of laundering money in Florida could not properly be tried in Missouri despite evidence that the laundered money had originated from criminal activity in Missouri. Id. at 10. But Cabrales was not a conspiracy case, and so the Court had no occasion to address what qualified as "an overt act in furtherance of" a conspiracy to commit money laundering. Cabrales thus merely reinforces the general rule that "venue is proper wherever any part of th[e charged] crime can be proved to have taken place." United States v. Razo, 782 F.3d 31, 41 (1st Cir. 2015).

[9] The juror's first name does not appear to be in the record.

that she "spoke with a noticeable accent, and was apparently foreign-born."

The government argues that Georgiadis's <u>Batson</u> claim fails because Georgiadis did not establish that Ms. Paunovic was a member of a "protected class." <u>Girouard</u>, 521 F.3d at 115; <u>see</u> <u>Gray</u> v. <u>Brady</u>, 592 F.3d 296, 305 (1st Cir. 2010) ("Part of a defendant's burden in making out a prima facie case of a <u>Batson</u> violation is to show that the strike was used on a juror who is a member of a cognizable group that has been or is currently subjected to discriminatory treatment." (internal quotation marks omitted)). But there is a separate flaw with Georgiadis's <u>Batson</u> claim: Georgiadis failed to show that the prosecutor struck Ms. Paunovic because she was "foreign-born" or because she spoke with an accent.

When Georgiadis objected to the prosecutor's use of a peremptory challenge on Ms. Paunovic, the District Court asked the prosecutor for his reason for striking her. After the prosecutor gave his reason, the District Court gave Georgiadis the opportunity to make further argument. A colloquy followed. The District Court then ruled that the prosecutor had stated "neutral reasons that have not been rebutted sufficiently by the defendant." We see no basis on this record for concluding that the District Court clearly erred in so finding. <u>See</u> <u>United States</u> v. <u>Charlton</u>, 600 F.3d 43, 50 (1st Cir. 2010).

In the colloquy with the District Court, the prosecutor made clear that he was not exercising a peremptory challenge because the juror was "foreign-born" or because she spoke with an accent. He explained instead that he was concerned that the juror might be unduly sympathetic to Georgiadis's potential argument that some of his criminal activity resulted from Georgiadis's lack of understanding of English. He based that concern on the juror's report, during individual voir dire, that her father once had trouble with law enforcement due to his own struggles with English.

The additional support that Georgiadis offers for his Batson claim is minimal. He contends that the prosecution struck the lone juror it was able to strike who "appear[ed] to be from th[e same] part of the world [as Georgiadis]." He emphasizes that the prosecution did not take its first opportunity to strike a different juror who reported having a bad experience with law enforcement. He also points out that Ms. Paunovic expressly professed her ability to be impartial. Such a showing is far too weak to demonstrate that the district court clearly erred in refusing to find that the juror was struck by reason of "purposeful discrimination." See Batson, 476 U.S. at 98.

**B.**

Georgiadis's second claim of trial error is that the District Court improperly admitted the testimony of FBI Special Agent Ian Smythe, which testimony Georgiadis contends was so

- 16 -

harmful that his convictions must be set aside.  We review a District Court's decision to admit or exclude evidence for abuse of discretion.  United States v. Rodríguez-Berrios, 573 F.3d 55, 60 (1st Cir. 2009).

Smythe's testimony was directed at comparing two sets of items: (1) paper printouts of e-mails associated with two Google e-mail accounts that the government contended were owned and used by Georgiadis and (2) electronic versions of e-mails on a hard drive that was recovered from an office used by Georgiadis and his co-conspirators.  Smythe testified that, based on his review, dozens of e-mails (which he proceeded to list) from the hard drive matched, were "exactly like," or were "the same as" corresponding e-mails reflected by the Google printouts.

The precise nature of Georgiadis's challenge to the admission of this testimony is far from clear.[10]  The main thrust of Georgiadis's argument appears to be that the prosecutor "bolster[ed]" Smythe's testimony about the provenance of the printouts by eliciting certain testimony that gave Smythe the credibility of an expert "without having produced the proper expert

---

[10] Georgiadis does cite to Federal Rule of Evidence 901(a) for the proposition that, in order to authenticate or identify an item of evidence, the proponent of such an item must come forward with "evidence sufficient to support a finding that" the item is what the proponent claims it to be.  But he is not challenging the authentication or admission of the Google printouts, and the prosecution never introduced the hard drive itself into evidence. It is thus not clear what application Rule 901(a) could have here.

report or expert discovery." Georgiadis also appears to argue that it was unfair for Smythe to be allowed to testify to his observations of a hard drive that was not itself produced as evidence. He compares that procedure to "call[ing] a fingerprint examiner, but refus[ing] to produce one of the two prints being compared." And, finally, Georgiadis stresses that Smythe himself admitted on cross-examination that the procedure to which he testified was "forensically unsound."

We need not parse the exact contours of Georgiadis's argument in order to locate what he has not: the specific Federal Rule of Evidence that he contends was violated. And that is because any error the District Court may have been committed in admitting Smythe's testimony was harmless.[11]

There was substantial evidence of Georgiadis's guilt that did not depend on the conclusion that Georgiadis actually sent and received any of the e-mails in question. The evidence at trial provided ample support for a jury to conclude that Georgiadis met with developers and represented himself both as a partner of

---

[11] Our conclusion obviates any need for us to resolve the parties' dispute about whether we may properly consider evidence put forth by Georgiadis in his post-trial motion for a new trial to show that Smythe's conclusions were inaccurate. Relatedly, we note that although Georgiadis states that he "is most certainly challenging the denial" of that motion for a new trial, he has made no developed argument relating to that motion, and so we deem any such argument waived. See United States v. Zannino, 895 U.S. 1, 17 (1st Cir. 1990).

- 18 -

Condo (his co-conspirator) and as the "European representative" of the non-existent fund that was supposedly going to provide financing for those developers. The evidence also provided support for a jury's reasonably finding that Georgiadis was one of three co-signatories on more than one of the bank accounts that received deposits from developers. And the jury could reasonably infer that money from those accounts was later transferred directly to Georgiadis's personal accounts.

Moreover, wholly apart from Smythe's testimony, there was a great deal of evidence tying Georgiadis to the e-mails contained in the Google printouts. The printouts included, among other things, personal e-mails sent to Georgiadis's girlfriend and an e-mail concerning the shipping of a car he owned. The latter e-mail included as an attachment a copy of Georgiadis's Greek passport and a notarized statement signed by Georgiadis. The government also introduced "customer profiles" for both of the disputed e-mail accounts, at least one of which listed the "contact name" for one account as "Evripides Georgiadis." That same customer profile also listed an address in Greece to which multiple wire transfers addressed to Georgiadis were sent during the conspiracy. And that customer profile also listed two credit cards owned by "Evripides Georgiadis" as associated with the account (as well as a third owned by DAC Global Energies LLC). Finally, according to the evidence at trial, the customer profiles for both

accounts each listed the same phone number, suggesting that they were owned by the same person.

Thus, even if we were to assume that the District Court erred in admitting Smythe's testimony, "it is highly probable that the error did not affect the verdict," see United States v. Delgado-Marrero, 744 F.3d 167, 179 (1st Cir. 2014). We therefore reject Georgiadis's challenge to the admission of Smythe's testimony.

## c.

Georgiadis's third claim of trial error is that the District Court erroneously denied his motion for a mistrial based on a concededly late disclosure by the prosecution of certain materials. [Blue Br. 53]. Our review is for abuse of discretion. United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000).

The late-disclosed materials included certain e-mail communications from four of the prosecution's victim-witnesses -- Gregory Dicker, Greg Petrini, Kenneth Davlin, and Gina Champion-Cain -- to the prosecution's victim-witness coordinator, Jessica Pooler. The late-disclosed materials also included the prosecutor's notes from his meeting with Dicker. The communications arguably showed that the four witnesses all had a financial or personal stake in obtaining a conviction of Georgiadis. And the prosecutor's notes arguably conflicted with Dicker's trial testimony.

District of Massachusetts Local Rule 116.2(b)(2) requires prosecutors to disclose, among other things, (A) "any information that tends to cast doubt on the credibility or accuracy of any witness . . . that the government anticipates calling" and (B) "any inconsistent statement, or a description of such a statement, made orally or in writing by any witness whom the government anticipates calling" at least twenty-one days prior to trial. D. Mass. Loc. R. 116.2(b)(2). Nonetheless, the prosecution disclosed the relevant communications and the relevant portion of the prosecutor's notes only after all four of the affected witnesses had testified.

In response, the District Court afforded Georgiadis the "customary remedy" for this type of violation: the opportunity to re-call the affected witnesses after he had had an opportunity to consider the late-disclosed materials. See United States v. Mathur, 624 F.3d 498, 506 (1st Cir. 2010). The District Court also expressly stated that it would afford Georgiadis "the maximum amount of leeway in his cross-examination with th[e affected] witnesses." Finally, the District Court indicated that it would give a cautionary instruction to the jury indicating that the affected witnesses were being re-called because the government had "inadvertently failed to disclose" certain information and thus

that the re-calling of witnesses could not be held against Georgiadis.[12]

Given these corrective measures, it is hard to see how the District Court abused its discretion. Georgiadis does argue that he could have made more effective use of the late-disclosed materials if he had had access to them prior to the start of trial. He contends that the ten-day delay preceding the re-cross-examinations rendered them ineffective. He further contends that the government's late disclosure of the impeachment materials -- which primarily related to the victim-witnesses' "financial interest and potential bias" -- prevented him from using those materials in his opening statement.

But, in reviewing a district court's denial of a motion for a mistrial for an abuse of discretion, we must be "mindful that the trial court has a superior point of vantage, and that it is only rarely -- and in extremely compelling circumstances --

---

[12] The limiting instruction the District Court later gave was as follows:

> Today we're going to interrupt the testimony of Mr. Brin and allow the defendant to recall a couple of witnesses who have already testified. They have been given some information that they didn't have, or he, I should say, was given some information they didn't have before, and he is exercising his right to recall these witnesses for a brief cross-examination. This is not the fault of the defendant, and it can't be held against him. So we're going to interrupt Mr. Brin's testimony and recall two witnesses today, and I think there's actually one more coming back tomorrow for brief further cross-examination. So with that, we will recall Mr. Dicker.

that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision." Freeman, 208 F.3d at 339 (internal quotation marks omitted).  And the District Court stated that the re-cross-examinations of those witnesses was "more powerful, not less powerful" because the government witnesses had to be specifically recalled.  Georgiadis also had the opportunity to highlight the financial interests and potential biases of the victim-witnesses in his opening statement, and he actually did so in his original cross-examinations of those witnesses.

Thus, Georgiadis has not shown the kind of "extremely compelling circumstances" that would require reversal of the District Court's decision to deny the motion for a new trial.  See id.; United States v. Tashjian, 660 F.2d 829, 838-39 (1st Cir. 1981) (upholding a District Court's denial of a mistrial motion where the late-disclosed materials "would have added little, if anything, to the effective cross-examinations already conducted" and the defendants were given the opportunity to recall witnesses).  The wealth of evidence against Georgiadis, which we have already detailed, only bolsters our confidence in that conclusion.

### D.

Georgiadis's final claim of trial error, which he also raised below, is that the District Court gave an erroneous instruction on reasonable doubt.  "We review preserved claims of

- 23 -

instructional error under a two-tiered standard: we consider de novo whether an instruction embodied an error of law, but we review for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues." United States v. Symonevich, 688 F.3d 12, 24 (1st Cir. 2012) (alterations and internal quotation marks omitted).

In charging the jury, the District Court instructed: "If . . . you view the evidence in the case as reasonably permitting either of two conclusions -- one that the defendant is guilty as charged, the other that the defendant is not guilty -- you will find the defendant not guilty." Georgiadis argues that such an "either-of-two-conclusions" charge is improper because it could lead a jury to believe that the standard of proof is less than proof beyond a reasonable doubt.

But in United States v. O'Shea, 426 F.3d 475, 483 (1st Cir. 2005), we considered an instruction that referred "to guilt and non-guilt, rather than innocence," and we concluded that the instruction did not require reversal because the District Court elsewhere made the standard of proof very clear. To be sure, O'Shea was decided on plain-error review, but we followed similar reasoning in upholding a similar instruction in United States v. Ranney, 298 F.3d 74, 79-80 (1st Cir. 2002), to which we cited in O'Shea.

Here, as in O'Shea, the District Court contrasted guilt with non-guilt rather than with innocence. The District Court also told the jury multiple times that the government had to prove Georgiadis's guilt beyond a reasonable doubt, and the Court described that burden accurately. We thus conclude that there is "no reasonable likelihood that the jury failed to understand the government's burden as proof beyond a reasonable doubt." Ranney, 298 F.3d at 80. Accordingly, we reject Georgiadis's challenge to the instructions.

## IV.

That brings us to Georgiadis's challenge to the reasonableness of his below-guidelines, 102-month prison sentence.[13] The government characterizes Georgiadis's challenge as if it is only to the sentence's substantive reasonableness, and Georgiadis does not expressly contest that characterization. But because some of his contentions have a procedural cast, we address both the procedural and the substantive reasonableness of the sentence. Our review as to both is for abuse of discretion. United States v. Madsen, 809 F.3d 712, 719 (1st Cir. 2016).

Georgiadis argues that the District Court failed properly to take into account two of the sentencing factors set

---

[13] In sentencing Georgiadis, the District Court calculated the guideline sentencing range to be 135 to 168 months. Georgiadis does not contest this guideline calculation.

- 25 -

out in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense," id. § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," id. § 3553(a)(6). And "failing to consider the § 3553(a) factors" is one of the procedural errors that can amount to an abuse of discretion. United States v. Vélez-Soto, 804 F.3d 75, 78 (1st Cir. 2015) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)). But there was no such failure here. The District Court explicitly stated at sentencing that it did consider the § 3553(a) factors. See United States v. Davila-Gonzalez, 595 F.3d 42, 49 (1st Cir. 2010) ("[T]he fact that the court stated that it had considered all the section 3553(a) factors is entitled to some weight."). The District Court also addressed the particular factors to which Georgiadis refers on appeal -- Georgiadis's lower degree of culpability and the possible disparity between his sentence and that of his co-conspirators.

Georgiadis's contention that his sentence was substantively unreasonable fares no better. He rests that challenge on his claim that his co-conspirators received lower sentences than he did, even though he played a lesser role in the conspiracy. The District Court did acknowledge that one of Georgiadis's co-conspirators -- Condo -- was "more culpable" than was Georgiadis. But the District Court also stated that Condo

"would have been sentenced to well more than ten years imprisonment had he not early on expressed his willingness to plead guilty and to accept full responsibility for his and your egregious crimes." The District Court then continued: "And although Mr. Condo was surely more culpable than you were, he was deserving of a substantial discount to which you are not entitled. You are not being punished for exercising your right to go to trial." We have consistently approved such reasoning in rejecting disparity challenges of the kind Georgiadis brings. See, e.g., United States v. Alejandro-Montanez, 778 F.3d 352, 357, 361 (1st Cir. 2015) ("[T]he district court did supply a sufficient reason for the disparity between Defendants and other conspirators: namely, the other conspirators pled guilty before trial.").

Moreover, the District Court stated that its below-guideline sentence was based on the harm Georgiadis caused his victims, the need to deter Georgiadis and others from committing similar crimes, and the fact that Georgiadis did not accept responsibility for his actions. That is "a plausible sentencing rationale" that led to a "defensible result." See United States v. Reyes-Santiago, 804 F.3d 453, 468 (1st Cir. 2015). We thus have no trouble concluding that Georgiadis's sentence is substantively reasonable. See United States v. Merritt, 755 F.3d 6, 12 (1st Cir. 2014) ("It is a rare below-the-range sentence that

will prove vulnerable to a defendant's claim of substantive unreasonableness.").

## V.

For the foregoing reasons, we **affirm**.